737 So.2d 132 (1999)
Diana K. PELOQUIN, Plaintiff-Appellee-Appellant,
v.
The EUNICE NEWS, Defendant-Appellant-Appellee.
No. 98-1524.
Court of Appeal of Louisiana, Third Circuit.
April 28, 1999.
*134 Michael W. Robinson, Eunice, for Diana K. Peloquin.
Andrew Holleman Meyers, Lafayette, for The Eunice News.
BEFORE: SAUNDERS, WOODARD, and DECUIR, Judges.
WOODARD, Judge.
In this workers' compensation case, Ms. Diana K. Peloquin injured herself while in the course and scope of her employment with the Eunice News (the News). Continental Casualty Company (CNA), the News' workers' compensation insurer, requested that she consult with several orthopedic surgeons, pursuant to which an arthroscopic surgery was performed. In spite of Ms. Peloquin's complaints of severe headaches, CNA denied her request to see a neurosurgeon and terminated Temporary Total Disability Benefits (TTD). Finding such a decision arbitrary and capricious, the workers' compensation judge ordered CNA to pay for the costs of consulting with a neurologist and physiatrist and issued $5,000.00 in attorney's fees. The News and CNA were also assessed with attorney's fees. However, the workers' compensation judge found that the issue of TTD was raised prematurely and postponed her judgment to after the filing of a neurologist's report. The News and CNA appeal, suspensively. Ms. Peloquin answers the appeal. We affirm in part and reverse in part.

FACTS
Ms. Diana K. Peloquin was injured while in the course and scope of her employment as an inserter with the News on February 14, 1995. She described feeling a "pop" in her right shoulder while she was reaching for newspapers rolling off a conveyor belt. Immediately, she felt pain in her right shoulder and neck area, yet she completed the remainder of her shift. She returned to work, as scheduled, the next morning, but had to stop working because she could not hold anything in her right hand. Ms. Earline Savoie filed an accident report and made an appointment for Ms. Peloquin to see Dr. John Lassere, a general practitioner, immediately.
Dr. Lassere diagnosed a right shoulder strain, a possible rotator cuff injury, and prescribed medication and physical therapy. Nevertheless, pursuant to Ms. Peloquin's persisting complaints, he referred her to Dr. Frazar Gaar, a board certified orthopedic surgeon, in Opelousas, Louisiana.
Dr. Gaar examined Ms. Peloquin on March 21, 1995 and noted that she complained of right and neck shoulder discomfort, burning sensations, and numbness radiating into her arm and hand. He diagnosed her with tightness in her neck, head, and right upper trapezius which is the muscle to the side of her neck. Pursuant to a bone scan which came back normal, Dr. Gaar ordered physical therapy at the termination of which he felt that Ms. Peloquin's condition was improving. Apparently, Mr. Ted Papas, the physical therapist, reported that Ms. Peloquin missed some of her appointments and endured severe headaches.
*135 In a May 3, 1995 visit to Dr. Gaar, Ms. Peloquin complained of periodic headaches for which she was taking Tylenol. Dr. Gaar was unable to determine the cause of her predicament and referred her to Dr. Rees, a specialist in pain management. Nevertheless, CNA refused the referral and demanded that Ms. Peloquin be seen by Dr. James Lafleur, another board certified orthopedic surgeon.
Pursuant to a June 22, 1995 visit, Dr. Lafleur ordered an MRI of the cervical spine and right shoulder, as well as electrical studies of the right shoulder and upper extremities. His first impression was that Ms. Peloquin suffered chronic neck and right shoulder pain. In a report dated July 19, 1995, he found that her MRI revealed mild degenerative changes of the right shoulder but no evidence of rotator cuff tear. He stated that the MRI of the cervical spine, as well as electrical studies, were within normal limits. His recommendation was that Ms. Peloquin had reached maximum medical improvement and should be allowed to return to her preinjury work duties.
Apparently, CNA authorized Ms. Peloquin to consult with Dr. Joe Turk, a chiropractor, on July 26, 1995. Dr. Turk reported his findings to be as follows:
Examination performed found decreased left rotation of the cervical spine, right and left flexion audible release heard. Tenderness of C2-5 on right, positive Soto-Hall test and positive cervical compression test on the right were also found. Neurological examination found deep tendon reflexes + 1 at C5 on right. Motor testing found weakness of right extremity and sensory testing within normal limits.
Dr. Turk noted that Ms. Peloquin suffered from "acute post traumatic cervical brachial radiculitis ... segmental dysfunction with spasms and ... cervicogenic headaches." Nevertheless, CNA refused to approve the recommended additional sessions. Instead, CNA ordered that Ms. Peloquin visit Dr. Gregory Gidman for an independent medical evaluation (IME) on September 7, 1995.
During her first visit with Dr. Gidman, Ms Peloquin described that she had severe headaches, which were made worse by using her right arm to mop. Pursuant to an October 4, 1995 visit, Dr. Gidman noted:
The right shoulder has marked crepitation over the anterior aspect of the right acromion when the arm is abducted 45 degrees and the arm is then placed in internal and external rotation. It is a pretty dramatic crepitation and popping, grinding sensation. You can palpate it as well as hear it....
I personally don't think that the lifting of bundles (worker's comp injury) was an organic cause of her headaches. She did not have any trauma to the head, did not fall, and she was not struck on the head. If a workup for her headaches is to be done, the best specialist for that, in my opinion, would be a neurologist.
Later, on October 11, 1995, Dr. Gidman referred Ms. Peloquin to Dr. John Shutte. Pursuant to an October 31, 1995 examination of Ms. Peloquin, Dr. Shutte made the following comments:
I think that Diana at this point probably has rotator cuff tendonitis. She has a marked amount of crepitance in her shoulder. I am somewhat surprised that she did not get relief from her injection. It is possible that she has also some mild cervical disc disease.
Then, following a March 5, 1996 examination:
On today's evaluation, she has tenderness over the acromion and greater tuberosity of her right shoulder. She has a positive impingement sign with forward elevation. I think that she does have significant rotator cuff tendonitis. I have talked to her about the benefits from an arthroscopic subacromion decompression and arthroscopic examination of her right shoulder.
A successful surgery was performed on April 24, 1996. Nevertheless, a post operative *136 report from Dr. Shutte, dated June 18, 1996, states that Ms. Peloquin "had had headaches before her surgery but they had gone away. Her headaches have now returned.... She states that she is going to get in touch with her GP concerning her headaches and possibly even see a neurologist if her pain persists."
In a deposition dated May 6, 1997, Dr. Gidman explained his previous diagnosis regarding Ms. Peloquin's headaches. First, he did not rule out that it could have been caused by some type of neck injury which could have caused headaches in the occipital region. He specified that the two nerves which come off the back of the neck and the upper neck and go up into the posterior skull and the occiput area may cause occipital headaches when irritated. He also clearly stated that his diagnosis regarding the headaches should be pondered by the fact that he is not a headache doctor and told Ms. Peloquin to see a neurologist. After the surgery, he did not effectively address the headache problems, thinking that Dr. Reginald Segar, Ms. Peloquin's long time family doctor, was taking care of it.
Dr. Gidman also mentioned that he told Ms. Mary Farfaglia, CNA's nurse the following:
"I don't remember the conversation off ( sic) top of my head. I very well did mention to her that she ought to see a neurologist for headaches. I don't know if I said that verbally (sic) to her on the phone, but it was certainly expressed in the report.... I made it pretty clear in the report here about the neurologist. If headaches were a problem, you know, that (sic) the one to work up the headaches."
Ms. Peloquin also consulted with Dr. Segar on March 18, 1996. She told him that her headaches had started with her injury to her right shoulder. He detected a right trapezius spasm, tenderness in the neck area and in the area of the great occipital nerve. He stated that, based on his findings, he "would have to say that the headaches are caused by this myofacial injury and spasms and inflammation and damage to the great occipital nerve, to the cervical muscle and ligaments, to the trapezius muscle on the right side and the spasm that's existing there." Although he was not sure how Ms. Peloquin sustained her injury, he stated that her headaches were clearly consistent with the type of problems that she had and were not migraine headaches for which he had treated her in the past.
In a deposition dated September 9, 1997, Ms. Rita Joyce Reeder, a Senior Claim Representative for CNA, explained that Dr. Gaar's referral for Ms. Peloquin to see a physiatrist had not been authorized by CNA. She justified CNA's decision on the grounds that Ms. Peloquin had been, instead, ordered to see Dr. Gidman. Also, CNA denied an October 23, 1996 request from Ms. Peloquin to see a neurologist. Regarding CNA's denial, Ms. Reeder stated the following:
I just told her on November the 6th when she requested again to see the neurologist that she had been released from treatment, the labor market survey had been done, she was signed off to return to the jobs that were on the labor market survey, and I had no records that showed that Dr. Gidman related the headaches to her injury, and had no specific referrals from Dr. Gidman. So I didn't authorize it.
Indeed, CNA had contacted vocational rehabilitation services in Eunice and three jobs corresponding to Ms. Peloquin's disability were found and approved by Dr. Gidman. However, Dr. Gidman explained in his deposition that his release for work was only made on the basis of the shoulder injury but not the headaches. Subsequently, benefits were terminated in November of 1996.
On December 2, 1996, Ms. Peloquin filed a petition to have her workers' compensation benefits reinstated. Pursuant to a hearing held on January 20, 1998, the *137 workers' compensation judge issued a judgment on July 6, 1998, finding that the issue of disability was tried prematurely and that the defendant had acted arbitrarily and capriciously in failing to ascertain the exact nature of Ms. Peloquin's condition and failing to provide her with reasonable medical care, and thus awarded $5,000.00 in penalties. Ms. Peloquin, CNA, and the News appeal.

ASSIGNMENTS OF ERROR
The News and CNA assert that the workers' compensation judge erred in:
1. Finding that the defendants failed to ascertain Ms. Peloquin's medical condition and to provide reasonable and necessary medical care.
2. Concluding that this case was prematurely tried on the issue of disability prior to the completion of reasonable medical treatment.
3. Finding that the defendants' handling of this claim was arbitrary and capricious for failing to provide reasonable medical care.
Ms. Peloquin answers the appeal, alleging that the workers' compensation judge erred in failing to award: (1) temporary total disability benefits; (2) penalties in addition to attorney's fees; and (3) attorney's fees in sufficient proportion.

LAW

APPEALABILITY OF THE JUDGMENT
Before we proceed with the merits of this appeal, we must determine whether the judgment issued by the workers' compensation judge is appealable. At the outset, we note that neither party briefed this issue. Nevertheless, we are not bound by the parties' decision because we can raise the issue sua sponte, that is, on our own motion, based on La.Code Civ.P. art. 2162. See Plauche v. Plauche, 95-979 (La.App. 5 Cir. 3/13/96); 673 So.2d 1053.
The issue is whether the judgment issued by the workers' compensation judge is a non-appealable partial judgment as provided in La.Code Civ.P. art.1915. The article defines partial judgments as follows:
A. A final judgment may be rendered and signed by the court, even though it may not grant the successful party or parties all of the relief prayed for, or may not adjudicate all of the issues in the case, when the court:
(1) Dismisses the suit as to less than all of the parties, defendants, third party plaintiffs, third party defendants, or intervenors.
(2) Grants a motion for judgment on the pleadings, as provided by Articles 965, 968, and 969.
(3) Grants a motion for summary judgment, as provided by Articles 966 through 969, including a summary judgment granted pursuant to Article 966(E).
(4) Signs a judgment on either the principal or incidental demand, when the two have been tried separately, as provided by Article 1038.
(5) Signs a judgment on the issue of liability when that issue has been tried separately by the court, or when, in a jury trial, the issue of liability has been tried before a jury and the issue of damages is to be tried before a different jury.
B. (1) When a court renders a partial judgment or partial summary judgment or sustains an exception in part, as to one or more but less than all of the claims, demands, issues, theories, or parties, whether in an original demand, reconventional demand, cross-claim, third party claim, or intervention, the judgment shall not constitute a final judgment unless specifically agreed to by the parties or unless designated as a final judgment by the court after an express determination that there is no just reason for delay.

*138 (2) In the absence of such a determination and designation, any order or decision which adjudicates fewer than all claims or the rights and liabilities of fewer than all the parties, shall not terminate the action as to any of the claims or parties and shall not constitute a final judgment for the purpose of an immediate appeal. Any such order or decision issued may be revised at any time prior to rendition of the judgment adjudicating all the claims and the rights and liabilities of all the parties.
(Emphasis added). In the instant case, relying on Bailey v. Smelser Oil & Gas, Inc., 620 So.2d 277 (La.1993), the workers' compensation judge found that the issue of TTD was tried prematurely and ordered that CNA pay for Ms. Peloquin's consultation with a physiatrist as recommended by Dr. Gaar and a neurologist recommended by Dr. Gidman. The judgment signed by the trial court on July 6, 1998, states the following:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that after the neurological consult and physiatrist treatment are completed, copies of medical reports issued by the neurologist and physiatrist are filed with the court.
Also, when enunciating her oral reasons for judgment, the workers' compensation judge stated:
That's it. Thank you gentlemen. After you get the neurological consult and the physiatrist treatment, I want to receive copies of their reports so that, you know, we keep the case moving forward.
Thus, clearly, the judge did not render a final judgment regarding Ms. Peloquin's entitlement to TTD. Also, the workers' compensation judge did not designate this case as being a final judgment, nor did the parties specifically agree that the judgment be treated as final, as required by La.Code Civ.P. art.1915. Accordingly, the judgment is not final, because it does not adjudicate all of the parties' claims. La. Code Civ.P. art. 1915(B)(2).
The workers' compensation judge held that Ms. Peloquin was entitled to medical benefits under the workers' compensation act and that CNA's denial of such benefits was arbitrary and capricious. Thus, because she adjudicated some of the parties' claims, it is an interlocutory judgment. La.Code Civ.P. art. 1841. La.Code Civ.P. art.2083 provides that an appeal may only be taken from a final judgment or from an interlocutory judgment which may cause irreparable injury.
In Hamilton Medical Group v. Ochsner Health Plan, 550 So.2d 290 (La.App. 3 Cir.1989), we stated that we may review such judgment under our supervisory jurisdiction when an ordinary appeal does not provide an adequate remedy or when the delays incumbent in an ordinary appeal will cause irreparable harm. In the case sub judice, to refuse to review the workers' compensation judge's decision, except via an ordinary judgment, will likely result in undue delay and an inefficient use of our judicial resources. See Benoit v. Louisiana Water Co., 93-1649 (La.App. 3 Cir. 4/11/94), 640 So.2d 396, writ denied, 94-1233 (La.7/1/94); 641 So.2d 208.
Therefore, based on the facts sub judice, we find that the proper mechanism by which our court should review the merits of this case is a writ of supervisory review.

FAILURE TO PROVIDE REASONABLE MEDICAL TREATMENT
An employer has a duty to provide an employee injured during the course and scope of her employment with "all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal." La.R.S. 23:1203(A).

Work-related Injury
Relying on Dr. Gidman's report, CNA argues that Ms. Peloquin's headaches are not related to the injuries that she sustained while in the course and scope of her employment with the News on February 14, 1995. It alleges that, at *139 best, she proved that her headaches may possibly be related to her work injury and, thus, she did not meet her burden of proof.
In order to establish a claim for medical benefits, the employee must show, by a preponderance of the evidence, that the predicament complained of arose as a result of a work-related accident. Alleman v. Fruit of the Loom-Crowley, 96-1246 (La.App. 3 Cir. 3/5/97); 692 So.2d 485. "Proof by a preponderance of the evidence is sufficient when the evidence taken as a whole, shows that the fact sought to be proved is more probable than not." Watkins v. Asphalt Assocs., Inc., 96-249 (La.App. 3 Cir. 12/4/96); 685 So.2d 393, 395. Therefore, it must be determined that the employment caused or contributed to the disability, albeit, it is not necessary that the exact reason be found. Augustus v. St. Mary Parish Sch. Bd., 95-2498 (La.App. 1 Cir. 6/28/96); 676 So.2d 1144.
In determining whether or not the claimant has discharged his burden of proof, the trier of fact should accept as true a witness' uncontradicted testimony, even though the witness is a party, absent circumstances casting suspicion on the reliability of that testimony. Watkins, 685 So.2d 393. The worker's testimony, alone, may be sufficient to discharge this burden of proof provided that two elements are satisfied: (1) no other evidence discredits or casts serious doubt on the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. Bruno v. Harbert Int'l Inc., 593 So.2d 357 (La.1992).
A workers' compensation judge's determinations as to whether the claimant's testimony is credible and whether the claimant met the required burden of proof are factual determinations which will not be disturbed on review absent manifest error or unless clearly wrong. In Bruno, the court stated that "[w]hen findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings...." Id. at 361 (quoting Rosell v. ESCO, 549 So.2d 840 (La.1989)). When the trier of fact's findings are reasonable in light of the entire record, an appellate court may not reverse a choice between two permissible views of the evidence. Banks v. Indus. Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97); 696 So.2d 551.
In the case sub judice, Dr. Gaar did not think that it was unreasonable that Ms. Peloquin's headaches were related to the injury she sustained while in the course and scope of her employment. Furthermore, in Dr. Segar's opinion, Ms. Peloquin's headaches were clearly consistent with her work-related injury. Dr. Gidman, in his October 4, 1995 report, stated that he did not think that the lifting of bundles was the organic cause of Ms. Peloquin's problems, but warned in his deposition that he was not a headache specialist and had little focus on Ms. Peloquin's headaches. Thus, the workers' compensation judge's decision is supported by the record.

Referral to a Neurologist
CNA alleges that the workers' compensation judge erred in concluding that it refused a referral to a neurologist when there is no evidence that any referral was ever made. We find no merit in this argument.
First, CNA clearly refused to authorize Ms. Peloquin's referral to Dr. Rees. Second, Dr. Gidman stated in his deposition that he mentioned that Ms. Peloquin should see a neurologist and states he clearly made a referral in his October 4, 1995 report when he stated that "[i]f a workup for her headaches is to be done, the best specialist for that, in my opinion, would be a neurologist." Finally, while no formal referral was made, it is clear that Ms. Peloquin requested to see a neurologist and that CNA denied her request. Whether or not a referral was technically made by a doctor, CNA did not investigate *140 the validity of Ms. Peloquin's request. Instead, it chose to rely on Dr. Gidman's self limiting opinion. Therefore, based on the facts in the record, the trial court did not commit a manifest error in finding Ms. Peloquin entitled to medical benefits.

ATTORNEY'S FEES
CNA claims that its decision to deny medical benefits was not arbitrary and capricious or without probable cause and, thus, the workers' compensation judge's decision to assess attorney's fees against it was unjustified. Ms. Peloquin answers that she should be awarded additional attorney's fees for the prosecution of this appeal.
La.R.S. 23:1201.2. The statute provides, in relevant part:
Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of all reasonable attorney's fees for the prosecution and collection of such claims.
Recently, the court in Brown v. Texas-LA Cartage, Inc., 98-1063, p. 5 (La.12/1/98), 721 So.2d 885, 888, specified that the terms "arbitrary and capricious" mean a "willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation." Generally, penalties and attorney's fees are not automatically applied upon nonpayment of the employee's benefits, although the insurer's decision is ultimately found erroneous. Miles v. F.D. Shay Contractor, Inc., 626 So.2d 74 (La.App. 3 Cir.1993). This court in Miles, also specified the nature of penalties and attorney's fees as follows:
The statutes authorizing penalties and attorney's fees where the insurer is arbitrary, capricious, or without probable cause in terminating compensation benefits are penal in nature and must be strictly construed so that insurers are not penalized for contesting a close factual question in a workers' compensation proceeding and relying on valid defenses.
Id. at 78.
Nevertheless, in Stegall v. J & J Exterminating, 94-1279 (La.App. 3 Cir. 3/1/95), 651 So.2d 400, 403, we found that "[a]n insurer may not proceed with an attitude of indifference to the injured worker's situation." (Citations omitted). An unjustified belief that an injury did not result from an accident does not excuse a failure to pay workers' compensation benefits. Nelson v. Roadway Ex-press, Inc., 588 So.2d 350 (La.1991).
The determination of whether an employee may be awarded penalties and attorney's fees is a question of fact which we will not disturb on appeal absent a finding of manifest error. Fontenot v. J.K. Richard Trucking, 97-220 (La.App. 3 Cir. 6/4/97); 696 So.2d 176.
From our review of the entire record, we cannot say that the workers' compensation judge committed manifest error in finding CNA's denial of medical benefits arbitrary and capricious. On the contrary, CNA chose to discard any opinion which did not favor its position that Ms. Peloquin did not need to see a neurologist. In her deposition, Ms. Reeder was asked by Ms. Peloquin's counsel what triggered her decision to deny Ms. Peloquin's visit to a neurologist. The following exchange took place:
MR. ROBINSON: Okay. Did you call Dr. Segar's office?
Ms. REEDER: I did not.
. . . .
MR. ROBINSON: Okay. And did she request that you approve or authorize her to be seen by a neurologist?
MS. REEDER: She told me that she had seen Dr. Segar andfor headaches, and that she needed to see a neurologist.

*141 MR. ROBINSON: Okay. Did you tell her that you would not approve her to be seen by a neurologist?
MS. REEDER: I just told her in November the 6th when she requested again to see the neurologist that she had been released from treatment, the labor market survey had been done, she was signed off to return to the jobs that were on the labor market survey, and I had no record that showed that Dr. Gidman related the headaches to her injury, and I had no specific referrals from Dr. Gidman. So I did not authorize it.
Thus, it appears that CNA's decision to pay for Ms. Peloquin's visit to a neurologist greatly relied upon Dr. Gidman's opinion that the headaches were not tied to the work-related injury. CNA chose to rely on such an optimistic assertion when it knew or should have known, either through Dr. Gidman's report or his telephone conversation with Ms. Farfaglia, that his diagnosis was, at best, self-limiting. Thus, considering Dr. Gidman's limited opinion regarding the headaches, it was unreasonable for CNA to deny Ms. Peloquin's request to see a neurologist.
Accordingly, the workers' compensation judge's decision is affirmed. We also grant Ms. Peloquin an additional $2,500.00 for the reasonable attorney's fees for the prosecution of this appeal.

PENALTIES
Ms. Peloquin alleges that the workers' compensation judge erred in denying her claim to penalties pursuant to La.R.S. 23:1201(F).
La.R.S. 23:1201 provides that the employer or insurer is liable for statutory penalties for withholding benefits without evidence to "reasonably controvert" the employee's right to compensation and medical benefits. Lucius v. H.B. Zachry Co., 95-1667 (La.App. 3 Cir. 5/8/96) 673 So.2d 1357, writ denied, 96-1483 (La.9/20/96); 679 So.2d 438. In Brown, 721 So.2d 885, 890, the supreme court specified that to reasonably controvert a claim, the employer must have some valid reasons or evidence upon which to base its denial of benefits. It stated, in relevant part:
Thus, to determine whether the claimant's right has been reasonably controverted, thereby precluding the imposition of penalties and attorney fees under La. R.S. 23:1201, a court must ascertain whether the employer or his insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed.
In the instant case, CNA introduced no evidence showing that it reasonably controverted Ms. Peloquin's claim to medical benefits for her headaches. Instead, it blindly relied on Dr. Gidman's self-limiting opinion. Thus, we hold that the workers' compensation judge had no reasonable basis to deny an award of penalties to her. Accordingly, we find that Ms. Peloquin is entitled to penalties in the amount of $2,000.00.

CONCLUSION
For the aforementioned reasons, we affirm Ms. Peloquin's award of medical benefits and attorney's fees. We award her an additional $2,500.00 for the reasonable attorney's fees for the prosecution of this appeal and reverse the part of the judgment, denying her request for penalties and award $2,000.00 in penalties on this ground.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.